UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim 1:23-cr-10186-3-ADB |
| | ) | |
| TREVON BELL | ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Now comes the defendant, Trevon Bell (hereinafter Mr. Bell), before this Honorable Court and respectfully submits the following Sentencing Memorandum in support of his request that this Court impose a sentence of 30 months concurrent with Docket No. 1:22-cr-10016-FDS followed by with three years of supervised release and conditions deemed appropriate by the Court. Mr. Bell is a much-loved and contributing part of his family and community. A sentence of 30 months concurrent with Docket No. 1:22-cr-10016-FDS followed by three years of supervised release is sufficient but not greater than necessary to achieve the purposes of sentencing pursuant to 18 U.S.C. § 3553(a) for the reasons discussed herein.

**Background**

Mr. Bell was born on October 16, 1996, and he and his brother, DeJontre were largely raised in Boston, MA. PSR ¶ 119 by his mother, Tamara and his maternal grandmother, Audrey. They all remain close in spite of the many hardships that he and family had to endure. Although he is now closer with his father, John Bishop, who lives in Brighton with his family and has gainful employment, he was largely estranged from his father for many years as

result of his father's lengthy period of incarceration, coupled with substance use disorder. PSR ¶¶ 119. Mr. Bell still keenly feels the results of the absence of his father in his life as a child and adolescence to this day. He also recognized the bitter irony that he is now effectively replicating the "sins" of his father, because his criminal conduct and incarceration are a direct cause for the absence in the lives of his own children. To be unavailable to enjoy their birthdays, holidays, and school and family events is a pain in his heart that he suffers with each day, and will use these dark memories to avoid the possibility of any future recidivism.

Mr. Bell was raised by his mother, Tamara (Tammy) Bell, when she wasn't in the hospital or being medically treated, his maternal grandmother, Audrey and her son, Uncle Joseph Bell from whom he bears his middle name. Uncle Joseph had a commercial driver's license and drove trucks which often caused him to be away from household. From Mr. Bell's viewpoint, his uncle was masterful with his hands and could fix anything, a skill that Mr. Bell admired very much and feels that he shares with him. To Mr. Bell, Uncle Joe was, to some degree, the father that he didn't have. Tragically, Joseph Bell passed away on March 2, 2024 from a heart attack at the young age of 48. Mr. Bell was unable to grieve with his family at his uncle's funeral because of his pretrial detention status, again a direct consequence of his conduct in the instant case, and he will carry the burden of that guilt for the rest of his life.

Mr. Bell and his mother have always shared a loving relationship, and she did her best to parent him when she wasn't hospitalized or in medical

rehabilitation as a result of diabetes, heart failure, and chronic kidney disease diagnosed at the age of six months, resulting in kidney failure, three kidney transplants. See Exhibit B. Mr. Bell says that his mother has been sick his whole life as far back as he can remember from his childhood, and he was an indispensable presence in her life. He cared for her medical needs, ran errands, and grocery shopped. In essence, he did age-appropriate chores for her to alleviate the challenges of her compromised medical state. Indeed, according to Tammy Bell, "[m]y son is really my backbone, my strongest family member....At the age of 15, Trevon's life started to change. I started to get sick again. Trevon tried so hard to care of me, making sure I went to dialysis. [H]e even sat with me some days at dialysis, then when we got home, he would try to cook for the household because I was too weak." *See* Exhibit B. This is yet another daily reminder for Mr. Bell about the very real and negative consequences of his actions on those he loves the most in his life.

Similarly, Mr. Bell is very close with his grandmother, Audrey Bell ("Nana"), who was often his surrogate mother because of his own mother's severe health issues. She too struggles with a myriad of health challenges including, but not limited to diabetes, high blood pressure, heart issues, including a prior heart attack, and breast cancer. She had previously donated a kidney to his mother. He hopes and prays that he will be able to see her again one day and hug her tightly. PSR ¶ 119.

Mr. Bell enjoys an excellent relationship with the mothers of his three children, Minrae Brown and Taisha Garcia. PSR ¶ 123-124. He considers

Elijah, age twelve and Ms. Brown's child from another relationship, like a son to him. He also has a son, Trevon Bell, Jr., who is also twelve, with Ms. Brown. He had been in a long-term relationship with Taisha Garcia, who is employed as an executive assistant for the Peabody House, and they co-parent a daughter, Zailanni Bell, who is seven years old. PSR ¶ 65.

For Mr. Bell, his children are his world. He describes his son, Trevon Bell, Jr. as a good kid, shy at first but is loving, thoughtful and respectful. He was recently diagnosed with dyslexia and ADHD and struggles academically. He also has an excellent relationship with Elijah and Mr. Bell is happy that Trevon Jr. and Elijah have each other. Zailani, age seven, is his heart; he describes her as a smart, playful, and happy child who loves her father and her nana. Before his recent detention, he supported his children financially, took them and picked them up from school and doctor's appointments, and actively co-parented with Ms. Brown and Ms. Garcia with whatever was necessary to do to love and support them.

As the court is well aware, studies overwhelmingly show that the imposition of a lengthy term of incarceration will have a long term and profound effect upon children and their families alike. Five out of eight studies found a significant association between parental incarceration and cognitive skills and academic performance. Having a parent in prison has been associated with poorer school performance (grades), lower educational achievement, higher absenteeism and dropout rates, and more attention

problem.[1] Parents who return from long periods of incarceration still dependent on institutional structures and routines cannot be expected to effectively organize the lives of their children or exercise the initiative and autonomous decision-making that parenting requires. Those who still suffer the negative effects of a distrusting and hypervigilant adaptation to prison life will find it difficult to promote trust and authenticity within their children. Those who remain emotionally over-controlled and alienated from others will experience problems being psychologically available and nurturant. Tendencies to socially withdraw, remain aloof or seek social invisibility could not be more dysfunctional in family settings where closeness and interdependency is needed.

A number of studies have highlighted the devastating impact of parental imprisonment on children.[2] As well as a significant sense of loss, many children experience stigma, social isolation, shame and fear.[3] This underlines the need to use non-custodial measures wherever possible to reduce the disruption and trauma of a parent's imprisonment.[4] Parental imprisonment

---

[1] McCauley E., Beyond the classroom: The intergenerational effect of incarceration on children's academic and nonacademic school-related outcomes in high school. *Socius.* 2020;**6**:1–13. doi: 10.1177/2378023120915369; Turney K., Chains of adversity: The time-varying consequences of paternal incarceration for adolescent behavior. *J. Quant. Criminol.* 2022;38:159–196. doi: 10.1007/s10940-020-09485-3; Brown C., Maternal incarceration and children's education and labor market outcomes. *Labour.* 2016;**31**:43–58. doi: 10.1111/labr.12086.

[2] Condry R, Scharff Smith P. *Prisons, punishment, and the family: towards a new sociology of punishment?* Oxford University Press, 2018.
[3] childrenofprisoners.eu/the-issues/
[4] Council of Europe Recommendation CM/Rec (2018) 5 of the Committee of Ministers to member States concerning children with imprisoned parents [online], 2018. Available: https://search.coe.int/cm/Pages/result_details.aspx?ObjectId=09000016807b3175 [Accessed 9 Jan 2020].

can have a negative impact on children's short-term emotional well-being, as well as their long-term health and social prospects.[5] The continued embrace of many of the most negative aspects of exploitative prisoner culture is likely to doom most social and intimate relations, as will an inability to overcome the diminished sense of self-worth that prison too often instills. Clearly, the residual effects of the post-traumatic stress of imprisonment and the re-traumatization experiences that the nature of prison life may incur can jeopardize the mental health of persons attempting to reintegrate back into the free world communities from which they came.

Indeed, there is evidence that incarcerated parents not only themselves continue to be adversely affected by traumatizing risk factors to which they have been exposed, but also that the experience of imprisonment has done little or nothing to provide them with the tools to safeguard their children from the same potentially destructive experiences. Greene, S., Haney, C., and Hurtado, A., "*Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children*," Prison Journal, 80, 3-23 (2000). The deleterious consequences of a prolonged term of incarceration upon Mr. Bell's daughter, sons and himself cannot be overstated.

The circumstances of Mr. Bell's childhood's childhood and adolescence growing up in Jamaica Plain was nothing less than traumatic and must be

[5] McGillivray C. *Rendering them Visible: a review of progress towards increasing awareness and support of prisoners' families.* Edinburgh: Families Outside, 2016. https://www.familiesoutside.org.uk/content/uploads/2017/12/Rendering-Them-Visible-FINAL.pdf [Google Scholar]

factored and contextualized in order to understand Mr. Bell's criminal history and his poor decision making in the instant case. Although Mr. Bell lived in a vibrant and loving community of friends and family, nonetheless the presence of gunfire, gang violence and poverty was a backdrop and a constant thrum in his daily life. When Mr. Bell was twelve years old, his childhood best friend was shot and killed in his presence and his brother, DeJontre was shot and suffered non-lethal injuries. PSR ¶ 121. This experience caused him to spiral out of control and he was diagnosed with Post-Traumatic Stress Syndrome ("PTSD'), anxiety and depression during his first commitment with the Department of Youth Services ("DYS"). PSR ¶¶ 131, 133. He also experienced suicide ideation while in DYS but fortunately did not act upon the impulse. ¶ 133. His PTSD was further exacerbated when he became the victim of a shooting incident in 2017 when he was getting into a taxi. ¶ 128. He was prescribed multiple medications in an effort to treat his PTSD and insomnia, but he discontinued his medications approximately four years ago because he wasn't comfortable with the side effects; he is, however, interested in mental health treatment during his period of incarceration. ¶134. Mr. Bell also suffers from migraines and asthma. ¶129.

Mr. Bell is a high school graduate, and has always been a hard worker as evidenced by a robust employment history for his age. ¶¶144-147. Jon Feinman, CEO and Founder of InnerCity Weightlifting wrote in support of Mr. Bell's involvement in his program as a level 1 personal trainer and indicates that he would be pleased to see Mr. Bell return to work with his program. See

Exhibit C. Mr. Bell loves mentoring others and is generous with his time and love. He started working at the age of nineteen with Roy Martin in Boston Youth Works, an at-risk youth program – Boston Youth Works that provides work to inner city youth to keep them off the street and out of trouble, as well as a crisis resource and wants to continue those services upon his release.

Although detained, he continues to educate and improve himself with whatever opportunities are provided to him. He previously signed up for online classes to take at Trinity College in Connecticut and the self-education and self-improvement courses that he has taken at Wyatt Detention Center during his period of pretrial trial detention, all of which bode well for his success.

**Applicable Guidelines**

On February 7, 2024, Mr. Bell pled guilty to Count Five of a five-count indictment charging him with Conspiracy to Conduct Enterprise Affairs in violation of 18 U.S.C. §1956(d). There is no plea agreement in this case.

Under 18 U.S.C. § 3553 (a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). In so doing, a sentencing court "may not presume that the Guidelines range is reasonable" but, instead, must use the factors set forth in § 3553 (a), to "make an individualized assessment based on the facts presented." Gall v. United States, 128 S.Ct. 586, 596 (2007). Thus, District Courts are now permitted to and, in the appropriate case, directed to consider whether disagreement with the Sentencing Commission's underlying policy results in a sentence that is unreasonably high. Kimbrough,

supra, 128 S.Ct. at 575; United States v. Boardman, 528 F.3d 86 (1st Cir. 2008); Martin, supra, 520 F.3d at 93-94.

The First Circuit has stressed that Kimbrough requires a "more holistic inquiry" than simply relying on the sentencing guidelines and that "section 3553 (a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the tread of an overarching principle." United States v. Yonathan Rodriguez, 527 F.3d 221, 228 (1st Cir. 2008). That overarching principle is to "impose a sentence sufficient but not greater than necessary." Id. In reaching a decision on what constitutes an appropriate sentence, the District Court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." Id. (Emphasis added).

In this case, the sentencing range suggested by the Sentencing Guidelines should be given minimal weight in determining the sentence that Mr. Bell receives for the reasons cited herein; instead, the now-familiar §3553 (a) factors dictate a sentence of 30 months and three years of supervised release.

**1. The Nature and Circumstances of the Offense and the History and Characteristics of the Offender**

**(a) Nature and Circumstances of Offense**

There is no question that the offense conduct here is objectively serious. That said, there is no question that this significant misstep has made an indelible imprint upon his life, but Mr. Bell has redoubled his efforts to prove himself worthy of redemption to this Court, and a sentence of 30 months, and

not the Guidelines range, is the appropriate sentence to be imposed. Although Mr. Bell's involvement in the instant office was a product of his inability at that time, he was worked hard to extricate himself from the pressure of prior toxic relationships. Mr. Bell has now "aged out" of these types of relationships and he is committing himself to educating himself and learning the lessons of the principles of restorative justice because he is living it in real time.

**(b) Mr. Bell's History and Circumstances**

Ms. Bell's personal history and circumstances have been extensively addressed in Probation's thorough report of his Personal Characteristics and this Sentencing Memorandum. Given these positive prognostic signs, as juxtaposed with the nature of his participation in the offense conduct at issue, a sentence of 30 months, one that is lower than the advisory guideline range suggested by Probation will be sufficient but not greater than necessary to effectuate the sentencing goals of 18 U.S.C. § 3553 (a).

**2. The Need for the Sentence Imposed to Promote Certain Statutory Objectives:**

**(A) to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense**

The offense conduct here is serious. In these circumstances, however, the Court should consider whether a sentence of 30 months, a sentence below the guideline range will be significant enough punishment which will far better reflect the seriousness of the defendant's conduct than does the sentencing range suggested by the *Guidelines* determination of Mr. Bell's offense level. The public's right to just punishment for the offense is vindicated by Mr. Bell's

willingness to accept responsibility for his criminal conduct, his conviction and punishment by a reasonable sentence. That right must also be evaluated within the prism of the individualized circumstances of a defendant's life experiences, his conduct, in particular, his suffering for and recognition of the harm that he inflicted on his family and his community because of his conduct, and, notwithstanding, their continued support of him. And most of all, the Court can feel confident that Mr. Bell has earned the trust of the Court by his efforts during his pretrial detention that confirms that he has worked harm to demonstrate that he is and will continue to arm himself with tools that will ensure that he is prepared to lead a productive and exemplary life upon his release; a sentence of 30 months benefits Mr. Bell *and* society;

**(B) to afford adequate deterrence to criminal conduct**

A sentence of 30 months in federal prison is significant. Although Mr. Bell's criminal history category is IV, two of his four criminal history points were Juvenile Adjudications. There can be little doubt that a 30 month term of incarceration will provide Mr. Bell with overwhelming deterrence to any thought of relapse in the future. As a matter of general deterrence, the efficacy of a more than a 30 month sentence is unsupported.

**(c) to protect the public from further crimes of the defendant**

In evaluating the likelihood of recidivism, peer-reviewed psychologists maintain that certain dynamic factors account for "criminogenic needs," including criminal peers, criminal history or history of antisocial behavior,

social achievement, and family structure.[6] Additionally, criminal companions, antisocial attitudes and current employment and educational problems are all strong predictors of recidivism. Other studies of recidivism's causes have maintained that poor engagement in non-criminal pursuits — such as employment and education — are risk factors for criminal recidivism.[7]
A number of researchers have conducted recidivism studies as a means of determining if certain treatment programs are effective in reducing recidivism. Peer group influence, according to these studies, is one powerful predictor of recidivism, albeit one more prevalent in youth offenders than older adults.[8]

Applying these metrics to Mr. Bell's personal characteristics, the likelihood of recidivism is remote, particularly because Mr. Bell will continue to embed multiple safety nets in his life using the tools that has and will continue to gather during his period of incarceration to deter any further criminal conduct;

(d) **To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment…**

Mr. Bell continues to take full advantage of available programming to improve his education, mental wellbeing, employment skills, and has been

---

[6] *See* https://www.simplypsychology.org/recidivism.html

[7] Id https://www.simplypsychology.org/recidivism.html

[8] Id https://www.simplypsychology.org/recidivism.html

consistently employed during period of pretrial determination. His prior employment history speaks in volumes to his impressive work ethic, and willingness to support himself and his family. And Mr. Bell has plans for gainful employment when he is no longer incarcerated. He wants to get his commercial driver's license just like his Uncle Joseph, and continue to work with at-risk youth to share with them the lessons learned from his poor decision making because of the confluence of his experienced poverty, trauma, and the lure of the street. Mr. Bell, like his uncle, is good with his hands. He'd like to start his own business, either a cleaning or window tinting company and, as his letters of support suggest, he's not afraid of hard work and working hard to succeed.

**C) A Compassionate and Fair Sentence is Consistent with the Factors Set Forth in 18 U.S.C. § 3553 (a) and Will Result in a Sentence that is Sufficient, but Not Greater than Necessary, to Effectuate the Purposes of Sentencing**

The Court has broad discretion to question and ameliorate the Guidelines range where, as here, the consequences of the Sentencing Commission's policy are unsupported by past sentencing practices, and lead to a result inconsistent with the sentencing goals expressed in 18 U.S.C. § 3553 (a). Martin, supra, 520 F.3d at 88-96 (approving 91 month downward variation from career offender guideline; "Kimbrough…opened the door for a sentencing court to deviate from the guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission.") See also U.S. v. Bryant, 571 F.3d 147, 153 (1st Cir.

2009)(§ 3553 (a) (factors, in context of "enormous" disparity between career offender and otherwise applicable guideline, justified variance). That discretion is at its apex where a particular guideline appears poorly supported empirically, perhaps suggesting an abdication of the Sentencing Commission's institutional role; in such a case the sentencing court's institutional advantage makes it far better suited to craft a just sentence. Kimbrough, supra 128 S.Ct. at 567, 574. See also Gall, 128 S.Ct. at 598 (recognizing institutional advantage of experienced district court judges who "see so many more Guidelines sentences than appellate courts do")(citing Koon v. United States, 518 U.S. 81 (1996)).

And finally any greater sentence of incarceration than 48 months, considering all of the reasons described herein is inconsistent with our society's guiding spirit of justice, humanity and redemption. Like many courts, this Court should give limited consideration to the Guidelines range and instead impose a sentence that more adequately considers all of the goals of sentencing as captured in the 18 U.S.C. § 3553(a) factors as stated herein. Those factors militate a sentence of 30 months and three years of supervised release on conditions of release that include, but are not limited to maintaining employment, receiving mental health treatment, participating in a restorative justice program and any other conditions as this Court sees fit to impose.

## CONCLUSION

For the foregoing reasons, this Court should impose a sentence of 30 months in the Federal Bureau of Prisons concurrent with Docket 1:22-cr-

10016-FDS, three years of supervised released, and other conditions of supervised release as to this Court seems just and proper.

Respectfully Submitted,
Trevon Bell
By his counsel,

Date: 09/08/2026

/s/ Vivianne Jeruchim_______
Vivianne Jeruchim, Esq.
BBO #547598
Jeruchim Law, P.C.
6 Beacon St., Suite 815
Boston, MA 02108
617/312-2255
aviva@jeruchimlaw.com

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 8, 2026.

Date: 09/08/2026

/s/ Vivianne Jeruchim_______
Vivianne Jeruchim, Esq.